WHITE, Appellant v. SABY, Respondent.

No. 9194

Submitted January 13, 1953. Decided June 2, 1953.

Rehearing Denied October 2, 1953.

260 Pac. (2d) 1116.

John D. Gillan, Havre, for appellant.

John Marriott Kline, Glasgow, Larry Persson, Wolf Point, for respondent.

Mr. Gillan, Mr. Kline and Mr. Persson argued orally.

MR. JUSTICE FREEBOURN:

The only question before this court is: Was the trial court right or wrong when, by instruction, it directed the jury to find its verdict in favor of defendant Saby on the first cause of action set forth in plaintiff White's amended complaint. It is from the judgment, following a verdict rendered in conformity to such instruction, that plaintiff appeals.

In this cause of action it was averred: That by virtue of a written agreement and contract covering the years 1945, 1946, and 1947, entered into by plaintiff and defendant, plaintiff was entitled to two-thirds of 6700 bushels of wheat harvested by defendant in 1946, from the west half of section 1 and the south half of section 12, in township 28, in Roosevelt County, Montana.

Judgment was asked for two-thirds of such wheat or for such proportion of the proceeds of the sale thereof.

Defendant admitted the signing of such written agreement and that he had harvested such amount of wheat, but contended that such agreement was valid and binding only for the year 1945.

According to the evidence, at and prior to the time the written agreement dated January 1, 1945, was entered into, Saby was led to believe that White owned such lands, but sometime later in 1945 he learned that White held such lands under leases from Indian owners. Such Indian leases provided that any subleasing of such lands could only be with the consent of the "lessor in writing" and with the "approval" of the proper United States government representative, and any "sublease * * * without such consent and approval shall be void."

The written agreement between plaintiff and defendant was made without such consent and approval.

Plaintiff's Indian leases dated January 1, 1941, expired

December 31, 1945. The one covering the west half of section 1 was with the Yellow Elk Walking Eagle estate, while the one covering the south half of section 12 was with Gerald Red Elk. During the life of the Indian lease with Yellow Elk Walking Eagle estate, the west half of section 1 passed to the Charles Dolezilek family. Charles Dolezilek testified: That White came to him in August 1945 and discussed again leasing the west half of section 1. ''Well, he asked me if we was going to lease this land, and I said, 'Hell, no!', and he drove away.'' He said he did not give White the lease because, ''Well, when my wife owned the land, he never paid the lease on time, always in March sometime.'' He said individuals from Glasgow and Sidney wanted to lease the land but he did not lease it to them. Dolezilek first talked to defendant about a lease on the land in December 1945, and such lease was entered into, becoming effective January 1, 1946, and defendant ''paid the rent at that time.''

Saby testified: That in September 1945 White had told him ''he [White] couldn't get the lease on the West Half of Section 1.'' Saby then went to Johnny Helmer, the head government employee ''at the agency,'' who told him, ''You get first chance on it because you've been farming it, and he said Mr. White is not going to have it any more.''

In December 1945, Saby saw Dolezilek to whom he said, ''I heard in town that this land was for lease and if I could rent it, and he said, 'Yes, if you want it go and talk to my wife,' so she was sitting out in the pickup and I went out and asked her about it, and she said, 'Yes, if it is OK with Charlie it is OK with me,' so we got up and went over to the bank and made the papers out.''

Concerning the Indian lease on the south half of section 12, Gerald Stevens testified: That he saw an advertisement in the Poplar Standard, a newspaper, offering the south half of section 12 for rent; that he drove out to see Gerald Red Elk about securing a lease of such land and that he signed such a lease in December 1945. He learned that defendant Saby was farming the land and wrote him ''in regards to the summer fallow.'' Saby came

to him and said, "he was farming it and that he would like to continue farming it." This was after Stevens had signed the lease at the bank. "I said that I didn't want to take anything away from anybody and that is why I didn't keep the lease."

According to Saby, Gerald Red Elk came to him about October 1, 1945, and "wanted to know if I wanted to rent some land and I told him that Wilber [White] was down at Poplar and to go down and see Wilber." Later, after he saw Stevens, he was told "the land was up for lease, and he said anybody could have it, if they wanted it." It was then that Johnny Helmer told him he could have first choice and that White was not "going to have it anymore."

It not only appears from the record that Saby held the leases on the two pieces of land in question during the year 1946 when the disputed wheat was raised and harvested, but it also appears that Saby performed all the necessary work in connection therewith; that he used his own machinery and provided and paid for the seed which was planted.

Appellant asserts that respondent is estopped to deny the relationship of landlord and tenant, which he contends exists between himself and Saby by virtue of such written agreement.

Respondent's answer to this contention is: That such written agreement is not a lease but is a crop share agreement under which the relationship of landlord and tenant does not exist, and that under such agreement Saby was a share cropper and not a tenant.

The written agreement speaks for itself and from its terms we must determine what the intent of the parties was when it was made. R. C. M. 1947, secs. 13-703, 13-705.

The written agreement is upon a printed form labeled "Farm Contract upon Shares," wherein White is described as the "owner" of the lands. It does not demise, lease, let, or rent the lands to Saby, or by any other term give Saby an estate in the lands. To the contrary, it gives Saby only the right of working on the lands while planting, raising and cropping the grain. It provides: "Witnesseth, that the party of the first part [Saby]

hereby agrees to * * * till and farm * * * sow and plant the lands in such crops as the party of the second part [White] shall direct.''

It leaves the title to and possession of the crops in White until division is made thereof, which division is made by White. Saby shall ''not sell or remove * * * any of the produce of said farm * * * until the final settlement, without the written consent of the second party [White]; and until such settlement, the title and possession of all grain * * * produced * * * shall be and remain in the party of the second part [White]'' who ''agrees * * * to give and deliver * * * the one-third share of all grain * * * so raised'' to Saby.

In Cook-Reynolds Co. v. Wilson, 67 Mont. 147, 214 Pac. 1104, 1105, this court said: ''We believe the concise statement found in 8 R. C. L. 374, correctly states such general rule: 'The difference between a cropper and a tenant is that a tenant has an estate in the land for the term, and consequently he has a right of property in the crop. If he pays a share of the crop for rents, it is he who divides the crop and turns over to the landowner his share, and until such division the right of property and of possession in the whole is his. A cropper has no estate in the land, and although he has in some sense the possession of the crop, it is only that of a servant, and the possession is in law that of the landowner, who must set off to the cropper his share.' ''

In Wells-Dickey Co. v. Embody, 82 Mont. 150, 266 Pac. 869, 874, this court said: ''Here we have a contract in which the parties declared their intention in no uncertain terms; possession and right to possession of the land and title to the crops were to remain in first party, who, on completion of the contract, would deliver three-fourths of the crops produced to the producer as payment for his labor and investment. Such an agreement is but a contract of employment; it is the converse of the usual farm lease on crop rental, under which the tenant is held to be in possession of the land and the owner of the crop. Here the producer of the crop is but a 'cropper' or sublimated employee; his possession is that of his employer, and, until division is made,

title to the crop remains in the employer. This distinction has been heretofore clearly drawn. Cook-Reynolds Co. v. Wilson, 67 Mont. 147, 214 Pac. 1104; Kester v. Amon, 81 Mont. 1, 261 Pac. 288.'' See also Union Central Life Ins. Co. v. Audet, 94 Mont. 79, 21 Pac. (2d) 53, 92 A. L. R. 571, and Gibbons v. Huntsinger, 105 Mont. 562, 74 Pac. (2d) 443.

It is plain that the written agreement, under the law and facts, is not a lease of the lands, and the relationship of landlord and tenant did not exist between White and Saby. Such written agreement to all intents and purposes, was a so-called share-cropper agreement.

It is essential to the existence of a contract that there should be a sufficient cause or consideration. R. C. M. 1947, sec. 13-102.

The consideration passing from White to Saby, which bound Saby to the terms of the written agreement, was the right whereby Saby was permitted to go upon the lands and sow, cultivate and crop such lands.

Since White had no right of possession in such lands in 1946, because he could not secure leases thereon, he had no authority under which Saby could go upon the lands, or seed, cultivate and crop such lands, and the consideration passing from White to Saby, which obligated Saby to carry out his part of the written agreement, for 1946, was wanting and no longer existed.

The written agreement or contract between White and Saby therefore was ended and terminated, because the existence of such consideration was essential to the existence of the contract and written agreement. R. C. M. 1947, sec. 13-102. Failing to fulfill his obligation under the written agreement, White could not require Saby to perform any obligation thereunder. R. C. M. 1947, sec. 58-209.

For the reasons stated the court was right in giving the jury the instruction complained of, and the judgment of the district court is affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY, ANGSTMAN and ANDERSON, concur.